IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CYBERLOCK CONSULTING, INC.,    )
                               )
     Plaintiff,                )
                               )
          v.                   )    1:12cv396 (JCC/TCB)
                               )
INFORMATION EXPERTS, INC.,     )
                               )
     Defendant.                )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant
Information Experts, Inc.'s Motion to Dismiss [Dkt. 7] (the
"Motion").  For the following reasons, the Court will grant in
part and deny in part Defendant's Motion.

### I. Background

This case arises out of Defendant Information Experts
Inc.'s ("IE") alleged breach of a Teaming Agreement[1] that it
entered with Plaintiff Cyberlock Consulting, Inc. ("Cyberlock")
for the purpose of obtaining a contract award from the federal
government.

### A.    Factual Background

---

[1] Teaming agreements are special arrangements among private contractors
commonly used in connection with large government projects.  *EG&G Inc. v.
Cube Corp.*, 63 Va. Cir. 634, 2002 WL 31950215, at *2 (Va. Cir. Ct. Dec. 23,
2002).  Pursuant to these agreements, "subcontractors generally provide
technical expertise, financial support, and other general assistance in
preparing the prime contractor's bid submission, in exchange for the prime
contractor's promise to award a subcontract.  *Id.*

Cyberlock provides, among other things, project management and cyber security services and solutions for the federal government. (Compl. [Dkt. 1] ¶ 5.)  In November 2008, Cyberlock entered into a subcontract with IE to perform those types of services pursuant to a prime contract that IE had obtained with the Office of Personnel Management ("OPM") and its Federal Investigative Services ("FIS") division. (*Id.*) Cyberlock completed its work on this project in September 2011.

Shortly thereafter, OPM revealed that it would be seeking bids for a new project involving the same type of work. (Compl. ¶ 7.)  On October 4, 2011, Cyberlock and IE entered into a Teaming Agreement (the "Teaming Agreement") for the purpose of obtaining a contract award (the "Prime Contract") from OPM. (Compl. ¶ 8; Def.'s Mem. Ex. A ("Teaming Agreement") ¶¶ 1, 4(a).)[2]  Under the Teaming Agreement, IE agreed that, in the event it was awarded the Prime Contract by OPM, it would "execute a subcontracting agreement to provide [Cyberlock] 49% of the Prime Contract for the work anticipated to be performed by [Cyberlock]." (Compl. ¶ 9; Teaming Agreement ¶ 4(i).) Exhibit A to the Teaming Agreement set out information relevant to Cyberlock's role, and provided that "[Cyberlock] will perform 49% of the functions and scope of work as relayed by the

---

[2] Although the Teaming Agreement is not attached to the Complaint, the Court may consider it in connection with Defendant's Motion, as it is integral to and explicitly relied on in the Complaint and Plaintiff does not challenge its authenticity. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Plaintiff acknowledges that the Teaming Agreement is properly before the Court.  (Opp. [Dkt. 11] at 3 n.1.)

Government in the Prime Contract awarded to [IE]." (Compl. ¶ 9; Teaming Agreement Ex. A.) Pursuant to Exhibit A, Cyberlock was required to, among other things, submit cost and price data to support IE's pricing strategy planning. (Compl. ¶ 10; Teaming Agreement Ex. A.) The parties agreed that they would "exert reasonable efforts to obtain an [IE] Prime Contract" and "to negotiate a subcontract in . . . in accordance with Exhibit A." (Compl. ¶ 13; Teaming Agreement ¶ 4(a).)

IE allegedly confirmed the 51%/49% split of the anticipated Prime Contract in an e-mail conversation between Keith Ebersole, Cyberlock's Executive Vice President, and Adam Levin, IE's Executive Vice President. (Compl. ¶ 14.) On January 25, 2012, Ebersole e-mailed Levin and proposed that they work on the terms of the subcontract and conclude their discussion on pricing once the exact pricing was completed as part of IE's proposed response to the government. (*Id.*) Ebersole stated that the pricing for the subcontract "[s]houldn't be too difficult with this being Fixed Price and applying the already agreed 51%/49% split to the total price." (*Id.*) Levin responded: "Agreed." (*Id.*)

OPM subsequently issued a request for proposal ("RFP") to IE seeking a bid for the performance of project management services. (Compl. ¶ 15.) The services were to be completed in the form of fixed price monthly deliverables to FIS. (*Id.*)

Cyberlock provided IE with its breakdown of price per deliverable. (Compl. ¶ 16.) Consistent with the RFP, this information was stated on a fixed price basis. (Compl. ¶ 17.) Cyberlock also, however, provided a breakdown of labor categories, rates and hours, which OPM requested in its RFP for the purpose of conducting a price reasonableness evaluation. (Compl. ¶ 18.)

Cyberlock requested that IE negotiate and execute a subcontract that would take effect if IE was awarded the Prime Contract, but IE refused. (Compl. ¶ 19.) On February 14, 2012, however, Levin allegedly represented that IE would execute a subcontract with Cyberlock the day the Prime Contract was awarded. (*Id*.) On or about February 22, 2012, OPM awarded the Prime Contract to IE. (Compl. ¶ 20.) Notwithstanding Levin's alleged representation, IE did not execute a subcontract with Cyberlock that day. (Compl. ¶ 21.) Instead, IE e-mailed a draft Subcontracting Agreement (the "Subcontract") to Cyberlock on March 1, 2012. (Compl. ¶ 22.) The Subcontract contained terms and conditions different from those previously agreed to by the parties in the Teaming Agreement, including the aforementioned 51%/49% split. (*Id*.)

On March 2, 2012, Cyberlock informed IE that certain terms in the Subcontract needed to be revised so that they would align with the Teaming Agreement. (Compl. ¶ 23.) Cyberlock

4

requested, among other things, that the Subcontract be on a fixed price basis, as required by the Teaming Agreement, and specify the monthly deliverables for which Cyberlock was responsible. (*Id.*) Cyberlock also requested the revision or removal of provisions governing how Cyberlock would be permitted to staff the project, permitting IE to hire away Cyberlock employees to perform IE's share of the work, and giving IE the right to withhold the necessary authorization for Cyberlock to perform the monthly deliverables in the Subcontract. (*Id.*) IE allegedly ignored most of the requested revisions and made only two minor edits to the Subcontract. (Compl. ¶ 24.) IE allegedly sent its revised version of the Subcontract to Cyberlock on March 2, 2012, and requested that Cyberlock execute and return it by the next business day on March 5, 2012. (*Id.*)

Additional attempts by Cyberlock to negotiate the terms of the Subcontract ultimately fell through. On March 8, 2012, Levin instructed Cyberlock to contact IE's Vice President of Operations, Moe Baker Maktabi. (Compl. ¶ 27.) Maktabi informed Cyberlock that his hands were tied and that he could not make any revisions to the Subcontract. (*Id.*) Maktabi allegedly stated that IE was proposing a time and materials Subcontract instead of a fixed price Subcontract because the Prime Contract was based on time and materials. (*Id.*) Cyberlock alleges that this representation was false, and that

5

the Prime Contract was in fact fixed price. (*Id.*) The Subcontract provided that Cyberlock could earn $1,139,871.36 for its work on the project. (Compl. ¶ 28.) Maktabi allegedly represented that this amount was equal to Cyberlock's 49% share of the Prime Contract. (*Id.*) Cyberlock alleges that this representation was also false, and that the $1,139,871.36 amount was approximately $200,000 less than the true 49% share of the Prime Contract. (*Id.*)

The next day, Cyberlock's counsel spoke with Levin. (Compl. ¶ 30.) Levin allegedly misrepresented that the reason why the Subcontract required Cyberlock to hire a certain number of employees who were to work a maximum number of hours (instead of listing monthly deliverables with fixed pricing) was due to a requirement by the government, hence implying that the Prime Contract was not fixed price. (*Id.*) IE also allegedly refused to provide the Statement of Work under the Prime Contract or evidence that the Prime Contract required the Subcontract to be structured as IE represented. (*Id.*)

Cyberlock continued to press IE on its requested revisions. (Compl. ¶ 31.) On March 16, 2012, Maktabi informed Cyberlock that he would send a revised Subcontract on March 19. (Compl. ¶ 32.) During this conversation, Maktabi allegedly represented that the Prime Contract did not contain a list of specific deliverables separate from the Statement of Work.

6

(*Id.*)  This representation was allegedly false.  (*Id.*)  Despite Maktabi's representation otherwise, Cyberlock never received a revised Subcontract on March 19.  (*Id.*)

Cyberlock made further attempts to negotiate with IE's counsel.  (Compl. ¶ 33.)  On March 26, 2012, IE's counsel provided a revised Subcontract, which was still based on time and materials and not fixed price.  (Compl. ¶ 34.)  He also e-mailed a redacted copy of the Prime Contract, which, Cyberlock alleges, redacted the monthly deliverables and the fixed pricing thereof.  (*Id.*)  According to Cyberlock, the redacted Prime Contract revealed that prior representations made by IE, including those by Levin and Maktabi, were false.  (Compl. ¶ 35.)  In particular, the redacted Prime Contract allegedly revealed that: (1) there was a list of specific deliverables with fixed pricing; (2) OPM had not imposed a time and materials Prime Contract on IE; (3) there was no required number of employees that had to work under the Prime Contract; (4) there was no description of any labor categories, rates, or number of hours listed in the redacted Prime Contract, which would support IE's representation that the Prime Contract was time and materials; and (5) the total price stated in the redacted Prime Contract was $2,724,308, which demonstrates that the $1,139,871.36 amount inserted into all prior versions of the

Subcontract was, contrary to IE's representations, less than Cyberlock's 49% share of the Subcontract.  (*Id.*)

Cyberlock alleges that the revised Subcontract sent on March 26, 2012, again violated the Teaming Agreement.  (Compl. ¶ 36.)  Specifically, Cyberlock alleges that the revised Subcontract (1) was still based on time and materials; (2) while it increased Cyberlock's share to $1,334,912.64, did not authorize Cyberlock to perform any work; (3) made it impossible for Cyberlock to earn the $1,334,912.64 because, to work the necessary number of hours to earn this amount, Cyberlock employees would have had to give up most of their vacation time and work federal holidays; (4) allowed for termination of the Subcontract without default by Cyberlock; (5) still allowed IE to reduce Cyberlock's compensation if IE did not approve Cyberlock's staff within fourteen days of the start of the revised Subcontract's term (and gave IE *carte blanche* to withhold approval); and (6) failed to provide a description of what Cyberlock was required to do and the criteria for acceptance of work.  (*Id.*)

On March 30, 2012, Cyberlock gave IE three days to decide whether it would agree to Cyberlock's requested revisions and, if so, to send a revised Subcontract.  (Compl. ¶ 37.)  On April 2, 2012, IE responded that it would not "give in to

certain terms" and that therefore the parties would be unable to reach an agreement.  (Compl. ¶ 38.)

    B.   <u>Procedural Background</u>

Plaintiff filed suit in this Court on April 11, 2012. [Dkt. 1.]  The Complaint includes claims for breach of contract (Count I) and fraud (Count II).  On May 16, 2012, Defendant filed a Motion to Dismiss.  [Dkt. 7.]  Plaintiff filed its opposition on May 30, 2012 [Dkt. 11] to which Defendant replied on June 4, 2012 [Dkt. 13].  Oral argument was held on June 8, 2012.

Defendant's Motion is before the Court.

## II.  Standard of Review

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff.  *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).  In addition to the complaint, documents integral to and explicitly relied on in the complaint may be considered if the plaintiff does not challenge their

authenticity.   *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

In deciding a Rule 12(b)(6) motion, a court must be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted).   To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.   However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, *id.*, and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.   Moreover, a court "is

not bound to accept as true a legal conclusion couched as a
factual allegation." *Iqbal*, 556 U.S. at 678.

Rule 9(b) imposes a heightened pleading standard for
fraud claims.  "In alleging fraud [], a party must state with
particularity the circumstances constituting fraud or mistake.
Malice, intent, knowledge, and other conditions of a person's
mind may be alleged generally." Fed. R. Civ. P. 9(b).  To
satisfy the heightened pleading standard of Rule 9(b), a
plaintiff must state with particularity "the time, place, and
contents of the false representations, as well as the identity
of the person making the misrepresentation and what he obtained
thereby." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th
Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776, 784 (4th Cir. 1999)), *rev'd on other grounds* 131
S.Ct. 2296 (2011).

### III. Analysis

IE moves to dismiss Cyberlock's claims for breach of
contract and fraud for failure to state a claim.  The Court will
examine each claim in turn.

A.   Breach of Contract

IE argues that Cyberlock's breach of contract claim
fails because the Teaming Agreement is merely an "agreement to
agree," which is unenforceable under Virginia law.  Cyberlock
contends that the Teaming Agreement is an enforceable contract

11

that required IE to provide Cyberlock with a 49% share of the Prime Contract.

In Virginia, the elements for a breach of contract claim are (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of the obligation, and (3) an injury or harm to the plaintiff caused by the defendant's breach. *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (Va. 2006).[3]  For a contract to be enforceable, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (Va. 1981).  Mere "agreements to agree in the future" are "too vague and too indefinite to be enforced." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (Va. 1997); *see also Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002) ("It is well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable.").  In considering

---

[3] As a federal court exercising diversity jurisdiction, the Court must apply the choice of law rules of the forum state, *i.e.*, Virginia. *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  The Teaming Agreement contains a choice of law clause, which provides that "[t]his Agreement, performance hereunder, and any remedies available to the parties shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to the conflict of laws considerations." (Teaming Agreement ¶ 9.)  Virginia law favors contractual choice of law clauses, giving them full effect except in unusual circumstances, *Tate v. Hain*, 181 Va. 402, 410 (Va. 1943), none of which are present here.  Virginia law therefore governs Cyberlock's breach of contract claim.  Virginia law also governs Cyberlock's fraud claim, as the fraud claim arises from the parties' dealings in connection with the Teaming Agreement and under Virginia law choice of law clauses generally encompass contract-related tort claims. *See Weiler v. Arrowpoint Corp.*, No. 1:10cv157, 2010 WL 1946317, at *4 (E.D. Va. May 11, 2010) (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)).

whether an agreement is an enforceable contract or merely an agreement to agree, courts consider whether the document at issue includes the requisite essential terms and also whether the conduct of the parties and the surrounding circumstances evince the parties' intent to enter a contract. *See High Knob v. Allen*, 205 Va. 503, 507-08 (Va. 1964).

In support of its argument that the Teaming Agreement is an unenforceable agreement to agree, IE relies on two cases: *Shafer* and *Beazer*. In *Shafer*, the Virginia Supreme Court addressed whether a teaming agreement constituted an enforceable contract for the sale of digitizers. 254 Va. at 516. The court held that the teaming agreement was an unenforceable agreement to agree, noting that there was no mutual commitment by the parties, no obligation on the part of one of the defendants to sell the digitizers or on the part of the plaintiff to purchase them, no agreed price for the product, and no assurance that the product would be available when needed. *Id.* at 520. In *Beazer*, this Court, relying on *Shafer*, held that a provision in a letter of intent in which the parties agreed to negotiate a contract was an unenforceable agreement to agree. 235 F. Supp. 2d at 491.

Cyberlock, on the other hand, relies on *EG&G, Inc. v. Cube Corp.*, 63 Va. Cir. 634, 2002 WL 31950215 (Va. Cir. Ct. Dec. 23, 2002). There, the court held that a teaming agreement "is

13

an enforceable contract if it is clear that the parties intended
to enter into a binding contractual relationship and the
agreement contains sufficient objective criteria to enforce."
*Id.* at *7.  The court found that under the teaming agreement at
issue, there was a mutual commitment between the parties with
respect to the level of the plaintiff's involvement and the type
of work that it would perform if the defendant were awarded the
prime contract.  *Id.*  The plaintiff's work on the proposals to
the government served as consideration for the defendant's
promise to subcontract a portion of the prime contract to the
plaintiff.  *Id.*  Additionally, the court observed that the
teaming agreement required the parties to work together in an
"exclusive relationship" in order to prepare a response to the
RFP.  *Id.* at *8.  The teaming agreement also stated that if the
defendant won the contract award, the defendant "would be a
subcontractor on the [project] and perform a substantial amount
of the work -- up to 49% of the [prime] contract."  *Id.*  The
court further concluded that the teaming agreement sufficiently
stated the essential terms of a contract for services: (1) the
nature and scope of the work to be performed, (2) the
compensation to be paid for that work, (3) the place of
performance, and (4) the duration of the contract.  *Id.* at *9-
10.  Accordingly, an enforceable contract existed between the
parties.

Based on a careful reading of these cases, the Court concludes that Cyberlock has plausibly demonstrated that the parties intended to be bound by the Teaming Agreement and has thus sufficiently alleged a breach of contract claim for purposes of surviving a motion to dismiss.  Similar to *EG&G*, the Teaming Agreement here provides that upon the contract award, IE "*will* perform 51% of the scope of work with [Cyberlock] performing 49%."[4]  (Teaming Agreement ¶ 1 (emphasis added).)  *See EG&G*, 2002 WL 31950215, at *9 ("Most importantly, the agreement was not that [plaintiff] 'might' be a subcontractor "if" an agreement were worked out, but 'would' be a subcontractor . . . .")  Moreover, under a section entitled "Responsibilities and Performance," the Teaming Agreement states that "[i]n the event IE is awarded a prime contract for the Program, [IE] *agrees to* execute a subcontracting agreement to provide [Cyberlock] 49% of the Prime Contract for the work anticipated to be performed by [Cyberlock]."  (Teaming Agreement ¶ 4(a).)  The Teaming Agreement also created an exclusive relationship between IE and Cyberlock as far as seeking work on the Prime Contract with OPM.  (Teaming Agreement ¶ 3(a).)  *See EG&G*, 2002 WL 31950215, at *2 (teaming agreement "noted that the parties would work together 'on an exclusive basis'").

---

[4] This provision is actually more definite than its counterpart in *EG&G*, the latter providing that the plaintiff would be awarded "up to 49%" of the prime contract.  2002 WL 31950215, at *8.

The Court declines to find, at this early stage of the litigation, that the Teaming Agreement lacked the essential elements of a contract. Based on the e-mail exchange between Ebersole and Levin, the aforementioned 49% figure meant that Cyberlock was entitled to a 49% share of the value of the Prime Contract, thus supplying a sufficiently definite term as to price. That certain terms, including a precise numerical figure as to price, depended on information that would not be known until the Prime Contract was awarded does not render the Teaming Agreement fatally indefinite. *See EG&G*, 2002 WL 31950215, at *10 (noting that "at the time the parties executed the [t]eaming [a]greement, the parties were not yet in a position to specify certain terms of [plaintiff's] anticipated contract with [defendant], as NASA and the Navy had not yet issued the RFP for the [project]").

Moreover, Exhibit A to the Teaming Agreement sets forth Cyberlock's obligations in helping IE assemble a proposal for OPM. Among these were the obligations to "[p]rovide support to a management approach, staffing plan, [and] risk mitigation approach," and to "submit cost/price data," suggesting that the parties exchanged information pertaining to the nature and scope of work. Indeed, the court in *EG&G* relied on proposals submitted to the government in determining that the scope of nature and work had been clearly established by the parties.

16

2002 WL 31950215, at *10.  The court also held that the parties'
seeming failure to agree on two material terms was irrelevant
where the intent of the parties as to these terms was otherwise
clear.  *Id.*

It is true, as IE points out, that *EG&G* is
distinguishable in the sense that subsequent to the execution of
the teaming agreement, the parties executed a letter subcontract
and partially performed the prime contract.  *See* 2002 WL
31950215, at *9.  However, the authority on which IE relies is
likewise distinguishable.  In *Shafer*, the plaintiff was a
general contractor that sued its subcontractor after the
subcontractor initiated negotiations on a subcontract for the
sale of digitizers pursuant to a teaming agreement, but refused
to provide written assurances that it would deliver the
digitizers.  254 Va. at 518.  Yet the plaintiff's own evidence
established that, at the time it submitted its bid to the
government, it knew that the digitizers were not yet fully
developed.  *Id.*  Thus, unlike this case, it was the *plaintiff*
that sought to add terms to the subcontract inconsistent with
the facts and circumstances surrounding the teaming agreement.[5]
*Id.*

What this discussion also makes clear is that the
enforceability of a teaming agreement is a fact-dependent

---

[5] *Beazer* is even more readily distinguishable, as it involved a provision in a
letter of intent which was indisputably an agreement to negotiate.  235 F.
Supp. 2d at 490-91.

question and thus ill-suited for resolution on a motion to dismiss.[6]  As noted above, teaming agreements are enforceable if the parties intended to enter into a binding contractual relationship and the agreement contains sufficient objective criteria.  The parties' intent is evidenced not only by the terms of the Teaming Agreement, but also by the parties' conduct and the surrounding circumstances.  And here, Cyberlock alleges surrounding circumstances which plausibly suggest that the parties intended for the Teaming Agreement to constitute more than just an agreement to agree -- for example, the parties' previous collaboration on a project for OPM just prior to execution of the Teaming Agreement.  As such, the Court concludes that Cyberlock has adequately stated a breach of contract claim for purposes of surviving IE's Motion to Dismiss.

   B.   Fraud

       Cyberlock's fraud claim is based on allegations that IE misrepresented that it would work with Cyberlock on a project for OPM and that it would, upon award of the Prime Contract, execute a subcontract with Cyberlock with certain terms. Specifically, IE allegedly misrepresented that the subcontract would contain a 51%/49% split and that it would be stated on a fixed price basis.  Cyberlock alleges that these representations

---

[6] Indeed, it is telling that both *EG&G* and *Shafer* were decided after trials on the merits.  While *Beazer* was decided on a Rule 12(b)(6) motion, there the plaintiff did not dispute that the provision in question was an agreement to negotiate.  235 F. Supp. 2d at 490.  Rather, it argued that the agreement to negotiate was enforceable as a binding preliminary agreement -- an argument which was contrary to clear Virginia precedent.  *Id.* at 491.

were false when made, and that it reasonably relied on them when providing IE with the information necessary to assemble a proposal for OPM.  IE contends that Cyberlock's fraud claim is based entirely upon an unfulfilled promise or statement as to future events, which cannot support a cause of action for fraud. Alternatively, IE argues that Cyberlock fails to plead its fraud claim with sufficient particularity under Rule 9(b).

In Virginia, to succeed on a claim for fraud, a party must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."[7]  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (Va. 2005) (citations omitted).  Fraud claims "must relate to a present or a pre-existing fact, and cannot be predicated on unfulfilled promises or statements at to future events."  *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 454 (E.D. Va. 2009) (quoting *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 471 (Va. 2001)).  The reason for this rule is that a "mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it

---

[7] The elements of actual fraud and fraudulent inducement are effectively the same. "To state a cause of action for fraudulent inducement of contract under Virginia law, a plaintiff must allege that the defendant made 'misrepresentations [that] were positive statements of fact, made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into the contract.'" *Enomoto v. Space Adventures, Ltd.,* 624 F. Supp. 2d 443, 452 (E.D. Va. 2009) (quoting *Lucas v. Thompson,* 61 Va. Cir. 44, 2003 WL 483831, at *3 (Va. Cir. Ct. 2003)).

does not change its character." *Enomoto*, 624 F. Supp. 2d at 454 (citing *Patrick v. Summers*, 235 Va. 452, 454 (Va. 1988)).  Were the rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Blair Constr., Inc. v. Weatherford*, 253 Va. 343, 347 (Va. 1997) (quoting *Lloyd v. Smith*, 150 Va. 132, 145 (Va. 1928)).  That said, an exception exists where a defendant makes a promise that, when made, he has no intention of performing, in which case "th[e] promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *Station # 2, LLC v. Lynch*, 280 Va. 166, 172 (Va. 2010) (quoting *SuperValu, Inc. v. Johnson*, 276 Va. 356, 368 (Va. 2008)).

Here, Cyberlock attempts to invoke the exception by alleging that IE did not intend to execute a subcontract with a 51%/49% split despite representations to the contrary.  (Compl. ¶ 49.)  Cyberlock contends that there are factual allegations in the Complaint which plausibly support IE's lack of intent.  However, the factual allegations which Cyberlock cites are, in essence, that IE failed to execute a subcontract pursuant to the Teaming Agreement.  (*See* Compl. ¶¶ 19, 21-22, 27.)  While circumstantial evidence may be used to support a reasonable inference of fraud, mere failure to perform is generally not evidence of a lack of intent to perform at the time the contract was formed.  *Cf. Poth v. Russey*, 99 F. App'x 446, 454 (4th Cir.

2004) (finding that evidence of fraudulent intent, which related to the failure to perform obligations, was insufficient).  A contrary rule would lead back to the situation where every breach of contract claim could support a claim for fraud.

It is also worth noting that the Complaint contains factual allegations which demonstrate that IE was receptive to at least some of Cyberlock's proposed revisions to the Teaming Agreement -- for example when it increased Cyberlock's share of the prime contract by nearly $200,000.  (Compl. ¶ 36.)  This, of course, undermines the notion that IE never intended to perform pursuant to the Teaming Agreement.

In sum, Cyberlock fails to plead factual allegations, which plausibly suggest that IE made a promise it never intended to keep.  Cyberlock's fraud claim is therefore dismissed. Because this pleading deficiency can potentially be cured by the addition of good faith factual allegations demonstrating IE's lack of intent, dismissal is without prejudice.

### IV.  Conclusion

For these reasons, the Court will grant in part and deny in part Defendant's Motion.

An appropriate Order will issue.

/s/
June 26, 2012                      James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE