```
           IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA

                         Alexandria Division


CYBERLOCK CONSULTING, INC.,    )
                               )
     Plaintiff,                )
                               )
          v.                   )    1:12cv396 (JCC/TCB)
                               )
INFORMATION EXPERTS, INC.,     )
                               )
                               )
     Defendant.                )
```

## **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Information Experts, Inc.'s Motion to Dismiss [Dkt. 18] (the "Motion"). For the following reasons, the Court will grant Defendants' Motion.

### I.   Background

This case arises out of Defendant Information Experts Inc.'s ("IE") alleged breach of a Teaming Agreement[1] that it entered with Plaintiff Cyberlock Consulting, Inc. ("Cyberlock") for the purpose of obtaining a contract award from the federal government.

---

[1] As previously noted in the Court's Memorandum Opinion dated June 26, 2012, teaming agreements are special arrangements among private contractors commonly used in connection with large government projects. *EG&G Inc. v. Cube Corp.*, 63 Va. Cir. 634, 2002 WL 31950215, at *2 (Va. Cir. Ct. Dec. 23, 2002). Pursuant to these agreements, "subcontractors generally provide technical expertise, financial support, and other general assistance in preparing the prime contractor's bid submission, in exchange for the prime contractor's promise to award a subcontract. *Id.*

1

A.   Factual Background

Cyberlock provides, among other things, project management and cyber security services and solutions for the federal government. (Am. Compl. [Dkt. 17] ¶ 5.)  In November 2008, Cyberlock entered into a subcontract with IE to perform those types of services pursuant to a prime contract that IE had obtained with the Office of Personnel Management ("OPM") and its Federal Investigative Services ("FIS") division. (*Id.*) Cyberlock completed its work on this project in September 2011.

Shortly thereafter, OPM revealed that it would be seeking bids for a new project involving the same type of work. (Am. Compl. ¶ 9.)  On October 4, 2011, Cyberlock and IE entered into a Teaming Agreement (the "Teaming Agreement") for the purpose of obtaining a contract award (the "Prime Contract") from OPM. (Am. Compl. ¶ 10; Def.'s Mem. Ex. A ("Teaming Agreement") ¶¶ 1, 4(a).)[2]  Under the Teaming Agreement, IE agreed that, in the event it was awarded the Prime Contract by OPM, it would "execute a subcontracting agreement to provide [Cyberlock] 49% of the Prime Contract for the work anticipated to be performed by [Cyberlock]." (Am. Compl. ¶ 13; Teaming Agreement

---

[2] Although the Teaming Agreement is not attached to the Amended Complaint, the Court may consider it in connection with Defendant's Motion, as it is integral to and explicitly relied on in the Complaint and Plaintiff does not challenge its authenticity. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Plaintiff previously acknowledged that the Teaming Agreement was properly before the Court. (Opp. [Dkt. 11] at 3 n.1.)

2

¶ 4(i).) Exhibit A to the Teaming Agreement set out information relevant to Cyberlock's role, and provided that "[Cyberlock] will perform 49% of the functions and scope of work as relayed by the Government in the Prime Contract awarded to [IE]." (Am. Compl. ¶ 13; Teaming Agreement Ex. A.) Pursuant to Exhibit A, Cyberlock was required to, among other things, submit cost and price data to support IE's pricing strategy planning. (Am. Compl. ¶ 13; Teaming Agreement Ex. A.) The parties agreed that they would "exert reasonable efforts to obtain an [IE] Prime Contract" and "to negotiate a subcontract in . . . in accordance with Exhibit A." (Teaming Agreement ¶ 4(a); Am. Compl. ¶ 17.)

IE allegedly confirmed the 51%/49% split of the anticipated Prime Contract in an e-mail conversation between Keith Ebersole, Cyberlock's Executive Vice President, and Adam Levin, IE's Executive Vice President. (Am. Compl. ¶ 18.) On January 25, 2012, Ebersole e-mailed Levin and proposed that they work on the terms of the subcontract and conclude their discussion on pricing once the exact pricing was completed as part of IE's proposed response to the government. (*Id.*) Ebersole stated that the pricing for the subcontract "[s]houldn't be too difficult with this being Fixed Price and applying the already agreed 51%/49% split to the total price." (*Id.*) Levin responded: "Agreed." (*Id.*)

Contrary to the terms of the Teaming Agreement, Cyberlock alleges that IE did not intend to execute a subcontract providing Cyberlock with 49% of a prime contract with OPM. In addition, Cyberlock alleges that according to Dennis Schulte, an employee of IE at the time the Teaming Agreement was executed and who was the IE Program Manager on the first subcontract, IE intended to push out Cyberlock at the time of the award of the prime contract or soon after. (Am. Compl. ¶ 11.) Schulte allegedly indicated that IE did not have the necessary staff with the appropriate security clearances to perform under the prime contract. (Am. Compl. ¶ 12.) Cyberlock asserts that Levin conveyed to Schulte, at an unspecified time, that IE could do what it wanted to with respect to Cyberlock and that IE's plan was to hire and use Cyberlock's employees who had the appropriate security clearances to perform on the prime contract. (*Id.*)

Subsequent to the signing of the Teaming Agreement, OPM issued a request for proposal ("RFP") to IE seeking a bid for the performance of project management services. (Am. Compl. ¶ 19.) The services were to be completed in the form of fixed price monthly deliverables to FIS. (*Id.*) Cyberlock provided IE with its breakdown of price per deliverable. (Am. Compl. ¶ 20.) Consistent with the RFP, this information was stated on a fixed price basis. (Am. Compl. ¶ 21.) Cyberlock also, however,

4

provided a breakdown of labor categories, rates and hours, which OPM requested in its RFP for the purpose of conducting a price reasonableness evaluation. (Am. Compl. ¶ 22.)

Cyberlock requested that IE negotiate and execute a subcontract that would take effect if IE was awarded the Prime Contract, but IE refused. (Am. Compl. ¶ 23.) On February 14, 2012, however, Levin allegedly represented that IE would execute a subcontract with Cyberlock the day the Prime Contract was awarded. (*Id.*) On or about February 22, 2012, OPM awarded the Prime Contract to IE. (Am. Compl. ¶ 24.) Notwithstanding Levin's alleged representation, IE did not execute a subcontract with Cyberlock that day. (Am. Compl. ¶ 25.) Instead, IE e-mailed a draft Subcontracting Agreement (the "Subcontract") to Cyberlock on March 1, 2012. (Am. Compl. ¶ 26.) The Subcontract contained terms and conditions different from those previously agreed to by the parties in the Teaming Agreement, including the aforementioned 51%/49% split. (*Id.*)

On March 2, 2012, Cyberlock informed IE that certain terms in the Subcontract needed to be revised so that they would align with the Teaming Agreement. (Am. Compl. ¶ 27.) Cyberlock requested, among other things, that the Subcontract be on a fixed price basis, as required by the Teaming Agreement, and specify the monthly deliverables for which Cyberlock was responsible. (*Id.*) Cyberlock also requested the revision or

5

removal of provisions governing how Cyberlock would be permitted to staff the project, permitting IE to hire away Cyberlock employees to perform IE's share of the work, and giving IE the right to withhold the necessary authorization for Cyberlock to perform the monthly deliverables in the Subcontract. (*Id.*) IE allegedly ignored most of the requested revisions and made only two minor edits to the Subcontract. (Am. Compl. ¶ 28.) IE allegedly sent its revised version of the Subcontract to Cyberlock on March 2, 2012, and requested that Cyberlock execute and return it by the next business day on March 5, 2012. (*Id.*)

        Additional attempts by Cyberlock to negotiate the terms of the Subcontract ultimately fell through. On March 8, 2012, Levin instructed Cyberlock to contact IE's Vice President of Operations, Moe Baker Maktabi. (Am. Compl. ¶ 31.) Maktabi informed Cyberlock that his hands were tied and that he could not make any revisions to the Subcontract. (*Id.*) Maktabi allegedly stated that IE was proposing a time and materials Subcontract instead of a fixed price Subcontract because the Prime Contract was based on time and materials. (*Id.*) Cyberlock alleges that this representation was false, and that the Prime Contract was in fact fixed price. (*Id.*) The Subcontract provided that Cyberlock could earn $1,139,871.36 for its work on the project. (Compl. ¶ 28.) Maktabi allegedly represented that this amount was equal to Cyberlock's 49% share

6

of the Prime Contract. (*Id.*) Cyberlock alleges that this representation was also false, and that the $1,139,871.36 amount was approximately $200,000 less than the true 49% share of the Prime Contract. (*Id.*)

The next day, Cyberlock's counsel spoke with Levin. (Am. Compl. ¶ 34.) Levin allegedly misrepresented that the reason why the Subcontract required Cyberlock to hire a certain number of employees who were to work a maximum number of hours (instead of listing monthly deliverables with fixed pricing) was due to a requirement by the government, hence implying that the Prime Contract was not fixed price. (*Id.*) IE also allegedly refused to provide the Statement of Work under the Prime Contract or evidence that the Prime Contract required the Subcontract to be structured as IE represented. (*Id.*)

Cyberlock continued to press IE on its requested revisions. (Am. Compl. ¶ 35.) On March 16, 2012, Maktabi informed Cyberlock that he would send a revised Subcontract on March 19. (Am. Compl. ¶ 36.) During this conversation, Maktabi allegedly represented that the Prime Contract did not contain a list of specific deliverables separate from the Statement of Work. (*Id.*) This representation was allegedly false. (*Id.*) Despite Maktabi's representation otherwise, Cyberlock never received a revised Subcontract on March 19. (*Id.*)

7

Cyberlock made further attempts to negotiate with IE's counsel. (Am. Compl. ¶ 37.) On March 26, 2012, IE's counsel provided a revised Subcontract, which was still based on time and materials and not fixed price. (Am. Compl. ¶ 38.) He also e-mailed a redacted copy of the Prime Contract, which, Cyberlock alleges, redacted the monthly deliverables and the fixed pricing thereof. (*Id.*) According to Cyberlock, the redacted Prime Contract revealed that prior representations made by IE, including those by Levin and Maktabi, were false. (Am. Compl. ¶ 39.) In particular, the redacted Prime Contract allegedly revealed that: (1) there was a list of specific deliverables with fixed pricing; (2) OPM had not imposed a time and materials Prime Contract on IE; (3) there was no required number of employees that had to work under the Prime Contract; (4) there was no description of any labor categories, rates, or number of hours listed in the redacted Prime Contract, which would support IE's representation that the Prime Contract was time and materials; and (5) the total price stated in the redacted Prime Contract was $2,724,308, which demonstrates that the $1,139,871.36 amount inserted into all prior versions of the Subcontract was, contrary to IE's representations, less than Cyberlock's 49% share of the Subcontract. (*Id.*)

Cyberlock alleges that the revised Subcontract sent on March 26, 2012, again violated the Teaming Agreement. (Am.

8

Compl. ¶ 40.)  Specifically, Cyberlock alleges that the revised Subcontract (1) was still based on time and materials; (2) while it increased Cyberlock's share to $1,334,912.64, did not authorize Cyberlock to perform any work; (3) made it impossible for Cyberlock to earn the $1,334,912.64 because, to work the necessary number of hours to earn this amount, Cyberlock employees would have had to give up most of their vacation time and work federal holidays; (4) allowed for termination of the Subcontract without default by Cyberlock; (5) still allowed IE to reduce Cyberlock's compensation if IE did not approve Cyberlock's staff within fourteen days of the start of the revised Subcontract's term (and gave IE *carte blanche* to withhold approval); and (6) failed to provide a description of what Cyberlock was required to do and the criteria for acceptance of work.  (*Id.*)

On March 30, 2012, Cyberlock gave IE three days to decide whether it would agree to Cyberlock's requested revisions and, if so, to send a revised Subcontract.  (Am. Compl. ¶ 41.) On April 2, 2012, IE responded that it would not "give in to certain terms" and that therefore the parties would be unable to reach an agreement.  (Am. Compl. ¶ 42.)

   B. <u>Procedural Background</u>

Plaintiff originally filed suit in this Court on April 11, 2012.  [Dkt. 1.]  The Complaint included claims for breach

9

of contract (Count I) and fraud (Count II). On May 16, 2012, Defendant filed a Motion to Dismiss. [Dkt. 7.] On June 26, 2012, the Court denied Defendant's Motion as to Count I and granted Defendant's Motion as to Count II. [Dkt. 16.] With respect to Count II, the Court held that Cyberlock failed to state a claim for fraud because it had not pled factual allegations which plausibly suggested that IE made a promise it never intended to keep at the time that it entered into the Teaming Agreement. (Memorandum Opinion [Dkt. 15] ("Mem. Op.") at 21.) Because this pleading deficiency could "potentially be cured by the addition of good faith factual allegations demonstrating IE's lack of intent," the Court granted Cyberlock leave to amend. (*Id.*) Cyberlock was given ten days to file an amended complaint. (*See* Order [Dkt. 16].)

      Cyberlock filed an Amended Complaint on July 6, 2012. [Dkt. 17.] The Amended Complaint again includes a breach of contract claim (Count I) and a fraud claim (Count II), as well as a new claim for unjust enrichment (Count III) and a new breach of contract claim (Count IV). Defendant moved to dismiss Count II (fraud) of the Amended Complaint on July 16, 2012. [Dkt. 18.] Following a consent motion for an extension to file a response to Defendant's Motion, [Dkt. 21], Cyberlock filed its opposition on August 3, 2012. [Dkt. 23.] Defendant filed its reply on August 9, 2012. [Dkt. 24.]

Defendant's Motion is before the Court.

## II. Standard of Review

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).

In deciding a Rule 12(b)(6) motion, a court must be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted).

The Court must consider a two pronged approach when reviewing a complaint facing a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, the court must identify and reject legal conclusions unsupported by factual allegations

11

because they are not entitled to the presumption of truth.  *Id.* at 680.  "[B]are assertions" that amount to nothing more than a "formulaic recitation of the elements" do not suffice.  *Id.* (Citations omitted).  Second, assuming the veracity of "well-pleaded factual allegations," the Court must conduct a "context-specific" analysis drawing on "its judicial experience and common sense" and determine whether the allegations "plausibly suggest an entitlement to relief."  *Id.* at 679-681.  The plausibility standard requires more than a showing of "a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678.  A complaint that pleads facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the Court should be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

Rule 9(b) imposes a heightened pleading standard for fraud claims.  "In alleging fraud [], a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To satisfy the heightened pleading standard of Rule 9(b), a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity

12

of the person making the misrepresentation and what he obtained thereby." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)), *rev'd on other grounds* 131 S.Ct. 2296 (2011).

### III. Analysis

IE moves to dismiss Cyberlock's claim of fraud for failure to state a claim. Cyberlock's fraud claim is based on allegations that IE misrepresented that it would work with Cyberlock on a project for OPM and that it would, upon award of the Prime Contract, execute a subcontract with Cyberlock with certain terms. Specifically, IE allegedly misrepresented that the subcontract would contain a 51%/49% split and that it would be stated on a fixed price basis. Cyberlock alleges that these representations were false when made, that IE did not intend to execute a subcontract conforming with these terms but rather intended to push out Cyberlock around the time that the prime contract was awarded and hire Cyberlock's employees to perform on the prime contract, and that Cyberlock reasonably relied on IE's representations when providing IE with the information necessary to assemble a proposal for OPM. IE asserts that Cyberlock has failed to pled factual allegations demonstrating that, at the time the Teaming Agreement was executed, IE intended not to perform pursuant to that agreement. As a

result, IE contends that Cyberlock's fraud claim is based entirely upon an unfulfilled promise or statement as to future events, which cannot support a cause of action for fraud without a showing that the party possessed wrongful intent at the time that the promise was made.  Alternatively, IE argues that Cyberlock fails to plead its fraud claim with sufficient particularity under Rule 9(b).

In Virginia, to succeed on a claim for fraud, a party must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."[3]  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (Va. 2005) (citations omitted).  Fraud claims "must relate to a present or a pre-existing fact, and cannot be predicated on unfulfilled promises or statements at to future events."  *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 454 (E.D. Va. 2009) (quoting *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 471 (Va. 2001)).  This is because a "mere promise to perform an act in the future is not, in a legal

---

[3] As noted in the Court's previous Memorandum Opinion [Dkt.15], the elements of actual fraud and fraudulent inducement are effectively the same. "To state a cause of action for fraudulent inducement of contract under Virginia law, a plaintiff must allege that the defendant made 'misrepresentations [that] were positive statements of fact, made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into the contract.'"  *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 452 (E.D. Va. 2009) (quoting *Lucas v. Thompson,* 61 Va. Cir. 44, 2003 WL 483831, at *3 (Va. Cir. Ct. 2003)).

sense, a representation, and a failure to perform it does not change its character." *Enomoto*, 624 F. Supp. 2d at 454 (citing *Patrick v. Summers*, 235 Va. 452, 454 (Va. 1988)). Were the rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Blair Constr., Inc. v. Weatherford*, 253 Va. 343, 347 (Va. 1997) (quoting *Lloyd v. Smith*, 150 Va. 132, 145 (Va. 1928)).

A narrow exception to this general rule exists where a defendant makes a promise that, when made, he has no intention of performing, in which case "th[e] promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *Station # 2, LLC v. Lynch,* 280 Va. 166, 172 (Va. 2010) (quoting *SuperValu, Inc. v. Johnson,* 276 Va. 356, 368 (Va. 2008)). However, mere failure to perform is generally not evidence of a lack of intent to perform at the time the contract was formed. *Cf. Poth v. Russey*, 99 F. App'x 446, 454 (4th Cir. 2004) (finding that evidence of fraudulent intent, which related to the failure to perform obligations, was insufficient).

The Court previously found that Cyberlock failed to plead factual allegations which plausibly supported that IE possessed fraudulent intent before or at the time of the Teaming Agreement's execution. Instead, it concluded that Cyberlock's allegations amounted to nothing more than allegations regarding

15

IE's subsequent failure to perform pursuant to the Teaming Agreement. (Mem. Opp. at 20-21.) The Court granted Cyberlock leave to amend so that it could correct this deficiency by the addition of good faith factual allegations demonstrating IE's wrongful intent at the pertinent time. (*Id.* At 21.) However, Cyberlock has failed to do so.

The two new paragraphs of allegations to which Cyberlock cites as plausibly supporting IE's fraudulent intent consist of (1) legal conclusions and "bare assertions devoid of further factual enhancement," *Nemet Chevrolet, Ltd. V. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009), and (2) minimal facts which are "merely consistent with a defendant's liability," but fail to nudge Cyberlock's fraud claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). (*See* Am. Compl. ¶¶ 11, 12.)

First, Cyberlock's assertion that IE had no intent at the time of formation to execute a subcontract consistent with the Teaming Agreement is a legal conclusion which the Court is not bound to accept as true. (Am. Compl. ¶ 11.) Likewise, Dennis Schulte's statements that IE intended to push out Cyberlock and that Adam Levin conveyed to him that IE planned to hire away Cyberlock's employees to perform on the prime contract are bare assertions. (Am. Compl. ¶ 11.) Such assertions of

16

IE's intent or plan are not supported by sufficient facts or circumstances surrounding the Teaming Agreement's *formation*. In fact, these assertions fail even to specify the time at which such alleged intent or wrongful plan arose.[4] Thus, these assertions are not entitled to a presumption of truth.

Second, even assuming the veracity of Cyberlock's factual allegations that are well-pled, the allegations of IE's wrongful intent are insufficient to survive Defendant's Motion to Dismiss. *Iqbal*, 556 U.S. at 679-81. Disregarding the legal conclusions and unsupported bare assertions discussed above, Cyberlock's lone new well-pled factual allegation in support of IE's intent is that IE did not have the necessary staff with the appropriate security clearances to perform the work on the prime contract if it was awarded. (Am. Compl. ¶ 12.) IE's lack of necessary staff for the prime contract raises the possibility that IE had a master plan to lure away Cyberlock's employees after the award of the prime contract and had wrongful intent at the time of the formation of the Teaming Agreement. However, there also is an "obvious alternative explanation" that IE intended to execute a subcontract with Cyberlock pursuant with the Teaming Agreement in order to solve IE's staffing needs for

---

[4] The Court does not consider Cyberlock's later assertion in its opposition brief that Levin conveyed this plan to Schulte *before* the Teaming Agreement was executed. (*See* Opp. [Dkt. 23] at 4.) It is "axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Elliot v. Great Point Partners, LLC*, 2011 WL 6365, at *3, n.4 (E.D. Va. Jan. 5, 2011) (Cacheris, J.).

the prime contract. *Twombly*, 550 U.S. at 567. The likelihood of this alternate explanation is bolstered by the fact that Cyberlock and IE already had worked together successfully on a previous subcontract for the same type of work, completed just a few days before the Teaming Agreement was executed. (Am. Compl. ¶¶ 5, 6, 10.) As a result, Cyberlock's allegations of IE's wrongful intent at the time of the formation of the Teaming Agreement fail to cross the threshold between "possibility and plausibility of 'entitlement to relief." *Iqbal*, 556 U.S. at 678.

Without more factual allegations regarding the circumstances surrounding the formation of the Teaming Agreement, the Court cannot draw a reasonable inference that IE entered into that agreement with the intent ultimately not to perform. The remainder of Cyberlock's factual allegations purportedly supporting IE's intent repeat Cyberlock's prior allegations from its first Complaint regarding parties' negotiations over the subcontract after the prime contract was awarded to IE. (*See* Am. Compl. ¶¶ 23, 25-26, 31.) As the Court previously concluded, these allegations amount to nothing more than assertions that IE failed to execute a subcontract pursuant to the Teaming Agreement. As such, they are insufficient evidence of wrongful intent at the time of formation. (Mem. Op. at 20.)

Cyberlock has failed to add new good faith factual allegations that plausibly demonstrate IE's intent at the requisite time and its prior allegations on this point remain insufficient to support a claim for fraud.  As it has failed to meet the plausibility standard under *Iqbal* and *Twombly*, Cyberlock's fraud claim is dismissed without prejudice.

### IV.  Conclusion

For these reasons, the Court will grant Defendant's Motion.

An appropriate Order will issue.

|  |  |
|---|---|
|  | /s/ |
| September 4, 2012 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |

19