IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CYBERLOCK CONSULTING, INC.,    )
                               )
        Plaintiff,             )
                               )
        v.                     )      1:12cv396 (JCC/TCB)
                               )
INFORMATION EXPERTS, INC.,     )
                               )
                               )
        Defendant.             )

**M E M O R A N D U M    O P I N I O N**

This matter is before the Court on Defendant
Information Expert, Inc.'s ("Defendant" or "IE") Motion for
Summary Judgment [Dkt. 52], Plaintiff Cyberlock Consulting,
Inc.'s ("Plaintiff" or "Cyberlock") Motion for Partial Summary
Judgment [Dkt. 64], and IE's Motion to Strike Alleged Facts and
Evidence Supporting Plaintiff's Motion for Partial Summary
Judgment (the "Motion to Strike") [Dkt. 107].  For the following
reasons, the Court will grant IE's Motion for Summary Judgment,
deny Cyberlock's Motion for Partial Summary Judgment, and grant
IE's Motion to Strike.

**I.   Background**

This case arises out of Defendant IE's alleged breach
of a teaming agreement which it entered into with Plaintiff

1

Cyberlock for the purpose of obtaining a contract award from the federal government.

A.   Factual Background

Cyberlock provides, among other things, project management and cyber security services and solutions for the federal government.  (Am. Compl. [Dkt. 17] ¶ 5.)

1.   The First Teaming Agreement and First Subcontract

In the fall of 2008, Cyberlock entered into a teaming agreement (the "First Teaming Agreement") with IE in order to work together to secure a prime contract from the United States Office of Personnel Management ("OPM") and its Federal Investigative Services ("FIS") division.  (Def. MSJ Mem. ¶ 1-5 [Dkt. 53]; First Teaming Agreement, Def. Ex. A to Levin Decl. [Dkt. 55-1].)  The First Teaming Agreement specified that in IE's proposal for the prime contract, IE would "identify the areas of endeavor, tasks, and responsibilities of [Cyberlock], as set forth in the attached Exhibit A, 'Statement of Work.'" (First Teaming Agreement § 2.)  This "Statement of Work," a three page attachment, specifically covered provisions including the period of performance, place of performance, the requirement for key personnel, the format of the contract (Indefinite Term Indefinite Quantity), and project management requirements for the work that Cyberlock would be performing for IE.  (Ex. A to

First Teaming Agreement.)  Another one of the attachments to the
First Teaming Agreement, Exhibit D to that agreement, was the
specific subcontract which the parties intended to enter into
upon the award of the prime contract.  Accordingly, Section 7 of
the First Teaming Agreement stated that "[i]f, during the period
of this Agreement, a prime contract is awarded to [IE] as a
result of the proposal, [IE] will, within five (5) business days
from the date of award of the Task Order by the Government to
[IE], enter into the subcontract attached to this Agreement as
Exhibit D with [Cyberlock], subject only to the limitations in
Paragraph 8."  (First Teaming Agreement § 7 and Ex. D to First
Teaming Agreement.)  The First Teaming Agreement provided for a
number of occurrences under which the agreement would terminate,
none of which was the failure of the parties to successfully
negotiate a subcontract.  (*See* First Teaming Agreement § 16.)

On November 6, 2008, OPM awarded IE the prime contract
and that same day, IE and Cyberlock executed the subcontract
which was attached as Exhibit D to the First Teaming Agreement
(the "First Subcontract").  (Def. MSJ Mem. ¶ 8.)  Cyberlock
completed its work on this project in September 2011.  (*Id.* ¶
11.)

### 2. The Second Teaming Agreement

Shortly thereafter, OPM revealed that it would be
seeking bids for a new project involving similar work.  In

3

response, Cyberlock and IE entered into negotiations over a new teaming agreement (the "Second Teaming Agreement"), the teaming agreement at issue in this litigation. (*Id.* ¶ 16-19.) The parties executed the Second Teaming Agreement on October 4, 2011. (*Id.* ¶ 23; Second Teaming Agreement [Dkt. 55-1].) Pursuant to a merger or integration clause, the Second Teaming Agreement "constitute[d] the entire agreement of the parties hereto and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing." (Second Teaming Agreement § 10(c).) That clause also indicated that the Second Teaming Agreement "may be modified only in a written amendment signed by an authorized representative of the parties." (*Id.*) The Agreement also provided that "[d]uring the term of this Agreement each party will bear the respective costs, risks, and liabilities incurred by it as a result of its activities and obligations" and that "[n]either party shall have any right to any reimbursement, payment, or compensation of any kind from the other party during the term of this Agreement for efforts related to this Agreement." (*Id.* § 3(e).)

The Second Teaming Agreement stated that the agreement's purpose was "to set forth the arrangement between [IE] and [Cyberlock] to obtain an [IE] prime contract" for OPM FIS "and to set forth the basis for a subcontract between [IE]

and [Cyberlock]," and that "[u]pon Contract Award, [IE] will
perform 51% of the scope of work with [Cyberlock] performing
49%." (*Id.* § 1, "Purpose of Teaming Award.")  Under the section
titled "Responsibilities and Performance," the Second Teaming
Agreement stated that each party would "exert reasonable efforts
to obtain an [IE] prime contract for the Program and to
negotiate a subcontract for the Program in accordance with
Exhibit A." (*Id.* § 4(a).)  That section listed a number of pre-
award responsibilities of the parties. (*Id.* § 4(a)-(h).)  It
also stated that "[i]n the event [IE] is awarded a prime
contract for the Program, [IE] agrees to execute a
subcontracting agreement to provide [Cyberlock] 49% of the prime
contract for the work anticipated to be performed by
Subcontractor, as set forth in Exhibit A." (*Id.* § 4(i).)  The
section indicated that the "contemplated subcontract will
contain provisions passing down those terms and conditions of
the prime contract which must be passed on to [Cyberlock] in
order to comply with such prime contract, as well as those that
are reasonably necessary for [IE] to perform the requirements of
the prime contract." (*Id.* § 4(j).)  Exhibit A to the Second
Teaming Agreement stated that this exhibit "sets out the
anticipated Scope of Work and other pertinent information
relative to [Cyberlock's] role in the Program, as presently
understood by the parties.  In that regard, Subcontractor will

perform 49% of the functions and scope of work as relayed by the Government in the prime contract awarded to [IE]." (*Id.*, Ex. A.) Exhibit A, however, did not set out any further details about the work anticipated to be performed by Cyberlock. In addition, unlike the First Teaming Agreement, the Second Teaming Agreement did not include as an exhibit the subcontract the parties intended to execute if IE was awarded the prime contract contemplated in the Second Teaming Agreement. (Def. MSJ Mem. ¶ 30.) The Second Teaming Agreement reserved that the contemplated future subcontract "may be subject to the approval of the Client [OPM FIS] regardless of the provisions of this [Second Teaming] Agreement." (Second Teaming Agreement § 4(k).) Relatedly, it indicated that IE had the responsibility to "exert reasonable efforts to obtain Client approval for the proposed Subcontractor for the Program." (*Id.* § 4(b).)

Finally, in a section titled "Termination of Agreement," the parties specified that one of the occurrences under which the Second Teaming Agreement would be terminated was if there was a "failure of the parties to reach agreement on a subcontract after a reasonable period of good faith negotiations." (*Id.* § 5(j).)

3.  Efforts to Obtain Prime Contract, Award of Prime Contract, and Negotiations of Subcontract

On October 6, 2011, IE held a presentation for OPM FIS to discuss the new opportunity and possible prime contract. Both IE personnel and the president of Cyberlock, Greg Wallace, were present. (Flynn Decl. ¶ 12 [Dkt. 54].) On January 30, 2012, IE submitted its proposal for the OPM-FIS work. (Def. MSJ Mem. ¶ 35.) On February 22, 2012, OPM awarded the Prime Contract to IE. (*Id.* ¶ 41.) IE did not execute a subcontract with Cyberlock at that time. Instead, the parties actively began to negotiate a subcontract on March 1, 2012. (Def. MSJ Mem. ¶ 49.) The negotiations continued for about a month, with the parties exchanging several draft subcontracts, until IE concluded the negotiations on April 2, 2012 due to continuing differences between the parties regarding the terms of the proposed subcontract. (*Id.* ¶ 49-63; Maktabi Decl. [Dkt. 56].)

B.  Procedural Background

Cyberlock originally filed suit in this Court on April 11, 2012. [Dkt. 1.] The Complaint included a breach of contract claim (Count I) and a fraud claim (Count II). [*Id.*] On June 26, 2012, this Court denied in part and granted in part IE's first motion to dismiss, allowing Count I to proceed and dismissing Count II without prejudice. [Dkts. 15-16.] Cyberlock filed an Amended Complaint on July 6, 2012. [Dkt.

17.] The Amended Complaint included two breach of contract claims (Counts I and IV), a fraud claim (Count II), and an unjust enrichment claim (Count III). The Court granted IE's second motion to dismiss Count II on September 4, 2012. [Dkts. 27-28.] Upon the parties' consent motion, the Court dismissed Count IV on March 5, 2013. [Dkts. 47, 97.]

On March 1, 2013, the parties filed cross motions for summary judgment and accompanying memoranda in support. [Dkts. 52, 64.] Cyberlock filed its opposition to IE's Motion for Summary Judgment on March 12, 2013 [Dkt. 102]. IE filed its reply on March 18, 2013 [Dkt. 103]. With the Court's approval, Cyberlock filed an amended memorandum in support of its Motion for Partial Summary Judgment on March 5, 2013. [Dkts. 95, 97, 98.] On March 19, 2013, IE filed its opposition to Cyberlock's Motion for Partial Summary Judgment. [Dkt. 104.] Cyberlock filed its reply on March 22, 2013. [Dkt. 114.]

On March 19, 2013, IE filed its Motion to Strike. [Dkt. 107.] Cyberlock filed its opposition on March 22, 2013. [Dkt. 113.]

Cyberlock's Motion for Partial Summary Judgment, IE's Motion for Summary Judgment, and IE's Motion to Strike are before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden of showing the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a

"showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, the court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and quotation marks omitted). The fact that both sides moved for summary judgment "neither establish[es] the propriety of deciding a case on summary judgment, nor establish[es] that there is no issue of fact requiring that summary judgment be granted to one side or another." *Continental Air., Inc. v. United Air., Inc.*, 277 F.3d 499, 511 n. 7 (4th Cir. 2002) (citations and quotation marks omitted).

### III.  Analysis

A.  <u>Summary Judgment</u>

IE argues that it is entitled to summary judgment on Cyberlock's two remaining claims, its breach of contract and unjust enrichment claims in Counts I and III.  Cyberlock argues that it is entitled to summary judgment on its breach of contract claim.  The Court will consider each claim in turn.[1]

1.  <u>Breach of Contract Claim</u>

IE argues that it is entitled to summary judgment on Cyberlock's breach of contract claim for three reasons: (1) IE had no legally enforceable obligation to negotiate a subcontract or to provide Cyberlock with 49% of the OPM FIS prime contract; (2) if IE had a legally enforceable obligation to negotiate a subcontract with Cyberlock, it did not breach that obligation; and (3) if IE did breach a legally enforceable obligation to negotiate a subcontract with Cyberlock, Cyberlock still would not be entitled to recover for that breach because Cyberlock was the first party to materially breach the Second Teaming Agreement.  Cyberlock contends that it is entitled to summary judgment on its breach of contract claim because: (1) the parties intended to enter into a binding subcontract when they signed Second Teaming Agreement and that agreement contains the

---

[1] The Court notes that at the March 26, 2013 hearing on the cross motions for summary judgment, both parties reaffirmed that they believed this case should be resolved on summary judgment.

essential terms of a contract; (2) the Second Teaming Agreement requires IE to provide Cyberlock with 49% of the prime contract; and (3) IE breached the Second Teaming Agreement by failing to provide Cyberlock with 49% of the prime contract and by acting in bad faith in failing to finalize a subcontract.

In Virginia, the elements for a breach of contract claim are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of the obligation; and (3) an injury or harm to the plaintiff caused by the defendant's breach. *Ulloa v. QSP, Inc.*, 624 S.E. 2d 43, 48 (Va. 2006).[2] For the reasons discussed below, the Court concludes that the portions of the Second Teaming Agreement regarding the parties' post-prime contract award responsibilities (which are the obligations at issue in this claim) are unenforceable.

For a contract to be enforceable, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E. 2d 818, 820 (Va. 1981). Mere "agreements to agree in the future" are "too vague and too indefinite to be enforced." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E. 2d 514, 515 (Va. 1997). Similarly, it is "well settled under Virginia law that agreements to negotiate at some point in

---

[2] As established in this Court's June 26, 2012 Memorandum Opinion, Virginia law applies to this case. (*See* June 26, 2012 Mem. Op. [Dkt. 15] at 12 n.3.)

the future are unenforceable." *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002). Accordingly, "an agreement to 'negotiate open issues in good faith' to reach a 'contractual objective within [an] agreed framework" will be construed as an agreement to agree rather than a valid contract." *Virginia Power Energy Mktg., Inc. v. EQT Energy, LLC*, 3:11CV630, 2012 WL 2905110, at *4 (E.D. Va. July 16, 2012) (quoting *Beazer*, 235 F. Supp. 2d at 491).

The parties strongly disagree about their intent in entering into the Second Teaming Agreement and also about what sources of evidence this Court appropriately should consider in determining the parties' intent. IE asserts that, read as a whole, the plain terms of the Second Teaming Agreement unambiguously only required the parties -- post-award of the prime contract -- to exert reasonable efforts to negotiate a subcontract for work which might be awarded to IE by OPM FIS. As such, these post-award obligations are an unenforceable agreement to agree. Cyberlock, on the other hand, argues that this Court should consider the parties' conduct, communications, and negotiations, both pre- and post-prime contract award. From this evidence, it contends that the Court should conclude that the parties intended the Second Teaming Agreement to be a binding contract requiring IE to provide Cyberlock with 49% of

13

the prime contract, notwithstanding that a formal subcontract was to be prepared and signed.

In determining whether there was mutual assent to be bound, a court first must examine the language of the agreement itself. *Virginia Power*, 2012 WL 2905110, at *5; *see also Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002); *Schafer*, 493 S.E. 2d at 515; *Boisseau v. Fuller*, 30 S.E. 457, 457 (Va. 1898). "The guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Golding v. Floyd*, 539 S.E. 2d 735, 737 (Va. 2001) (citing *Magann Corp. v. Electrical Works*, 123 S.E. 2d 377, 381 (Va. 1962)).

The question of whether the language of a contract is ambiguous is a question of law and the Court's job is "to construe the contract made by the parties, not to make a contract for them." *Doswell Ltd. P'ship v. Virginia Elec. & Power Co.*, 468 S.E.2d 84, 88 (Va. 1996). The Court will not render an agreement ambiguous "merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement." *Doswell*, 468 S.E. 2d at 88. "Even though an agreement may have been drawn unartfully, the court must construe the language as written if its parts can be read together without conflict." *Id.* (citing *Berry v. Klinger*,

14

300 S.E.2d 792, 796 (Va. 1983)). The Court must read the agreement as a whole, single document and must gather the meaning of its language "from all its associated parts assembled as the unitary expression of the agreement of the parties." *Berry*, 300 S.E. 2d at 796.

If the Court finds that the agreement is unambiguous after examining only the language of the agreement itself and reading it as a whole, then the Court must disregard extrinsic evidence from before or after the agreement's formation. "[I]f the intent of the parties can be determined from the language they employ in their contract, parol evidence respecting their intent is inadmissible." *Golding*, 539 S.E. 2d at 737. In addition to communications and representations prior to the agreement's execution, the Court must "exclude[e] from its consideration as well either party's conduct under the contract." *Wuxi Letotech Silicon Material Tech. Co., Ltd., v. Applied Plasma Technologies*, 2010 WL 2340260, at *3 (E.D. Va. June 7, 2010). If the agreement is unambiguous, "the court is not at liberty to search for [an agreement's] meaning beyond the instrument itself . . . because the writing is the repository of the final agreement of the parties." *Berry*, 300 S.E. 2d at 796. Ultimately, "where the contractual language is clear," a "court may not . . . invite or accept the submission of extrinsic evidence, 'find' ambiguity in the contractual text based upon

that evidence, and resolve the found ambiguity by resort to that extrinsic evidence." *Schneider v. Cont'l Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993).

Before proceeding further, the Court finds it necessary to address a previous misapplication of these principles in this litigation. The Court concludes that in its prior June 26, 2012 Memorandum Opinion on IE's first motion to dismiss, the Court failed to attempt to first determine an unambiguous meaning of the Second Teaming Agreement by reading it as a whole and also critically erred in relying on allegations of extrinsic evidence -- in the form of allegations of pre- and post-award conduct, communications, and negotiations -- to assess whether Cyberlock plausibly had stated a claim. In that opinion, this Court used parol evidence to create an ambiguity over the parties' intent and then used such evidence to remove that ambiguity in so far as to find that Cyberlock plausibly had alleged that the parties intended for the Second Teaming agreement to constitute more than just an agreement to agree. In addition, in relying on such extrinsic evidence, the Court failed to take account of the Second Teaming Agreement's merger or integration clause which specified both that the agreement "constitute[d] the entire agreement of the parties hereto and supersedes all prior and contemporaneous representations, proposals, discussions, and communications,

whether oral or in writing" and that the agreement "may be modified only in a written amendment signed by an authorized representative of the parties." (Second Teaming Agreement § 10(c).)

For these reasons, the Court should not have relied on *High Knob, Inc. v. Allen*, 138 S.E. 2d 49, 52-53 (Va. 1964) to conclude that, in analyzing whether an agreement was an enforceable contract or an unenforceable agreement to agree, a court should consider whether the conduct of the parties and the surrounding circumstances evinced the parties' intent to enter into a binding contract. In *High Knob*, the court was dealing with the enforceability of oral agreements and the effect of the collateral contract doctrine on the parol evidence rule, an exception which holds that "parol evidence rule does not exclude parol proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing." *Id.* That situation is inapposite to the interpretation of the teaming agreement here, where the teaming agreement contained an integration clause and where any asserted bargain to provide Cyberlock 49% of the prime contract would ordinarily be expected to be embodied in the teaming agreement if such a bargain existed. Likewise, the Court concludes that the other precedent on which it based much of its

previous opinion, *EG&G, Inc. v. Cube Corp.*, 63 Va. Cir. 634, 2002 WL 31950215, at *7 (Va. Cir. Ct. Dec. 23, 2002), also mistakenly relied on *High Knob* for its analysis of a teaming agreement. To the extent that *EG&G* suggests that teaming agreements are a special arrangement to which Virginia's standard rules of contract interpretation, including the parol evidence rule, do not apply, the Court concludes that that case is incorrect and should not be followed. The Court also notes, contrary to Cyberlock's assertions, that there is nothing contradictory about finding that a contract unambiguously contains an unenforceable bargain between two parties. Application of the parol evidence rule requires a court to find that a contract is *unambiguous*, but not necessarily enforceable.

Upon reconsideration of the well-established Virginia legal principles regarding contract interpretation discussed above, and reading the Second Teaming Agreement as a whole instrument, the Court finds that the post-prime contract award obligations in the Second Teaming Agreement are unambiguous *and* constitute an unenforceable agreement to agree. In Virginia, any "writing in which the terms of a future transaction or later, more formal agreement are set out is presumed to be an agreement to agree rather than a binding contract." *Virginia Power*, 2012 WL 2905110, at *4. Indeed, calling an agreement something other than a contract or subcontract, such as a

18

teaming agreement or letter of intent, implies "that the parties intended it to be a nonbinding expression in contemplation of a future contract." *Id.* Moreover, even if the parties are "fully agreed on the terms of their contract," "the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement" which is binding. *Boisseau*, 30 S.E. at 457.

In this case, admittedly there is some language suggesting that IE was obligated to provide 49% of the prime contract to Cyberlock upon award of the prime contract. In the "Responsibilities and Performance" section, the agreement states that "[i]n the event [IE] is awarded a prime contract for the Program, [IE] agrees to execute a subcontracting agreement to provide [Cyberlock] 49% of the prime contract for the work anticipated to be performed by [Cyberlock], as set forth in Exhibit A." (Second Teaming Agreement § 4(i).) The "Purpose of Teaming Agreement" section also states that upon such award, IE "will perform 51% of the scope of work with [Cyberlock] performing 49%." (*Id.* § 1.)

The Court finds, however, that the agreement read as a whole indicates that this particular language was not meant to provide a binding obligation but rather to set forth a contractual objective and agreed framework for the

"negotiate[ion] [of] a subcontract in the future along certain established terms." *Beazer*, 235 F. Supp. 2d at 492. To start, the reference to the execution of a future subcontract in the statement that IE "agrees to execute a subcontracting agreement" if IE received a prime contract also could be read to indicate that the Second Teaming Agreement was not meant to function as the actual binding subcontract since "the parties [did] intend a formal [sub]contract to be drawn up." *Boisseau*, 30 S.E. at 457. Moreover, numerous other terms in the Second Teaming Agreement demonstrate that (1) the parties contemplated that a future, formal subcontract would have to be negotiated and potentially executed and (2) that they "contemplated the possibility that the future transaction discussed therein might not ever come to fruition." *Virginia Power*, 2012 WL 2905110, at *6; *see also Schafer*, 493 S.E. 2d at 515. In the "Responsibilities and Obligations" section, the agreement stated that the parties had the responsibility to "exert reasonable efforts . . . to negotiate a subcontract for the Program in accordance with Exhibit A." (Second Teaming Agreement § 4(a).) *See Virginia Power*, 2012 WL 2905110, at *7. The agreement also expressly acknowledged the possibility that such negotiations would fail, as the agreement provided that it would terminate in the event of the "failure of the parties to reach agreement on a subcontract after a reasonable period of good faith

negotiations." (*Id.* § 5(j).) Elsewhere, the Second Teaming Agreement referred to the subcontract and Cyberlock's work share within it in uncertain, tentative terms, describing the subcontract as "contemplated" (*id.* § 4(j)), describing the work share to be provided to Cyberlock as the "work anticipated to be performed" (*id.* § 4(i)), and qualifying Cyberlock's "role on the Program, as *presently understood* by the parties" (Ex. A to Second Teaming Agreement) (emphasis added). Finally, the Second Teaming Agreement reserved that "any such subcontract" entered into after the award of the prime contract "may be subject to the approval of the Client [OPM FIS] regardless of the provisions of this Agreement." (Second Teaming Agreement § 4(k).) *See Virginia Power*, 2012 WL 2905110, at *7.

    As a result, the Court concludes that the most reasonable reading of Second Teaming Agreement, construed as a whole, is that any seemingly mandatory language to award Cyberlock with a portion of the prime contract was modified by the provisions indicating that: (1) the award of such work would require the negotiation and execution of a future subcontract; (2) the award of such work was dependent on the success of such future negotiations; (3) any future executed subcontract was subject to the approval or disapproval of OPM FIS; and (4) suggesting that the framework set out for the work allocation in a future subcontract potentially could change as it merely was

based on the work anticipated to be performed by Cyberlock as then-presently understood by the parties. *See Boisseau*, 30 S.E. at 457 (concluding that "the use of such words [which otherwise would create a binding contract], however strong, will not constitute the instrument" a binding contract "if it can be clearly inferred from the rest of the paper that the parties had it in contemplation to enter into a future [contract]"); *see also Trianco, LLC v. Int'l Bus. Machines Corp.*, 466 F. Supp. 2d 600, 606 (E.D. Pa. 2006) *aff'd in part, vacated in part*, 271 F. App'x 198 (3d Cir. 2008) (concluding, although the teaming agreement "does include much seemingly mandatory language about the subcontract – for example, that 'IBM will award a subcontract' to Trianco," that "taking the Teaming Agreement as a whole, it is clear that this mandatory language is modified by the provisions that [the] award of a subcontract was contingent on further negotiations"). As such, the Court finds that the post-award obligations in the Second Teaming Agreement unambiguously set out an agreement to negotiate in good faith to enter into a future subcontract. As discussed above, such an agreement "is precisely the type of agreement to agree that has consistently and uniformly been held unenforceable in Virginia." *Virginia Power*, 2012 WL 2905110, at *7 (quoting *Beazer*, 235 F. Supp. 2d at 488, 493). Cyberlock's breach of contract claim, therefore, fails as a matter of law for lack of an enforceable

contract. *See id.* (resolving interpretation of teaming
agreement on summary judgment and finding that it was an
unambiguously unenforceable agreement to agree based on the
terms of the agreement as a whole).

## 2.   Unjust Enrichment Claim

In Count III of its Amended Complaint, Cyberlock
brings an unjust enrichment claim, arguing that it conferred a
benefit on IE when it provided IE with a price breakdown per
deliverable which IE needed to bid on the OPM FIS request for
proposal and when it provided its experience and expertise in
assisting IE in preparing its response to that request for
proposal. (Am. Compl. ¶ 58-59.) Cyberlock asserts that IE
accepted or retained these benefits without paying for their
value. In its Motion for Summary Judgment, IE argues that this
claim is barred by the existence of the Second Teaming Agreement
and by that agreement's express terms. (Def. MSJ Mem. at 30-
31.) At the March 26, 2013 hearing, Cyberlock acknowledged that
it did not contest summary judgment in favor of IE on this
claim. Accordingly, the Court finds that IE is entitled to
summary judgment on Cyberlock's unjust enrichment claim.

## B.   Motion to Strike

In its Motion to Strike, IE argues that this Court
should strike a number of Cyberlock's alleged facts and
corresponding proposed evidence in support listed in Cyberlock's

Motion for Partial Summary Judgment because IE contends that these facts and evidence are inadmissible. IE primarily objects to the facts at issue based on its argument that the Court should not use them to interpret the Second Teaming Agreement due to the unambiguity of that document and the document's integration clause. (*See* Def. Mot. to Strike [Dkt. 108] at 5-11.) As discussed extensively above, the Court agrees that, based on its conclusion that the Second Teaming Agreement is unambiguous and in light of the agreement's integration clause, it should not use extrinsic evidence to interpret the agreement's meaning and the parties' intent therein. The Court therefore will grant IE's Motion to Strike.

## IV. Conclusion

For the foregoing reasons, the Court will grant IE's Motion for Summary Judgment, deny Cyberlock's Motion for Partial Summary Judgment, and grant IE's Motion to Strike.

An appropriate Order will issue.

/s/
James C. Cacheris
April 3, 2013
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE